CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Fourth District   No. 4—87—0279

Opinion filed February 3, 1988.

Sheldon A. Zabel and Sara L. Johnson, both of Schiff, Hardin & Waite, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Joseph Madonia and James L. Morgan, Assistant Attorneys General, of counsel), for respondents.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

Petitioner Central Illinois Public Service Company (CIPS) appeals an order of the Illinois Pollution Control Board (Board) entered March 19, 1987, which affirmed the inclusion by the Illinois Environmental Protection Agency (Agency) of a condition in an operating permit for CIPS' steam generating unit MB—5 located at Meredosia, Illinois. The disputed condition provides that "$SO_2$ [sulfur dioxide] emissions shall not exceed 6.0 lbs per million btu."

The principal point of contention between the parties to this ap-

peal is the meaning of the following section of the Board's Emission Standards and Limitations for Stationary Sources, Sulfur Emissions:

> "No owner or operator of a fuel combustion emission source whose sulfur dioxide emission limitation is determined by Section 214.142, 214.183 or 214.184 shall cause or allow the total emissions of sulfur dioxide into the atmosphere from all fuel combustion emission sources owned or operated by such person and located within 1 mile radius (1.6 km) from the center point of any such fuel combustion source to exceed the level of sulfur dioxide emission allowed under the previous Rule 204 (effective April 14, 1972 until December 14, 1978) without first obtaining a new operating permit from the Agency. The application for a new operating permit from the Agency [sic]. The application for a new operating permit shall include a demonstration that such total emissions will not violate any applicable PSD [prevention of significant deterioration (in air quality)] increment."

(35 Ill. Adm. Code 214.186 (1985).)

Both sections 214.183 (35 Ill. Adm. Code 214.183 (1985)) and 214.184 (35 Ill. Adm. Code 214.184 (1985)) provide alternative emissions limitations applicable to "the total emissions of sulfur dioxide into the atmosphere in any one hour period from all fuel combustion emission sources, located outside of the Chicago, St. Louis (Illinois) or Peoria major metropolitan areas, owned or operated by [a] person and located within a 1 mile radius (1.6 km) from the center point of any such fuel combustion emission source." (35 Ill. Adm. Code 214.182 (1985).) Section 214.142 (35 Ill. Adm. Code 214.142 (1985)) prescribes an alternative sulfur dioxide emission limitation for "existing combustion sources with actual heat input less than, or equal to, 73.2 MW (250 mbtu/hr) located outside the Chicago, St. Louis (Illinois) or Peoria major metropolitan areas." The limitation contained in section 214.142 does not apply to total emissions of sulfur dioxide from all sources owned by the same person and located within a one-mile radius of each other; rather, the limitation contained in that section is expressed in terms of sulfur dioxide emissions per megawatt hour of actual heat input.

The parties agree that CIPS' Meredosia steam generating unit MB-5 is a solid fuel combustion source located outside of the Chicago, Peoria or St. Louis major metropolitan areas, and that it is a "large emission source," with an actual heat input of greater than 73.2 megawatts.

The previous Rule 204 to which section 214.186 refers provides in pertinent part:

"(c) Sulfur Dioxide Emission for Existing Fuel Combustion Sources

(1) Solid Fuel Burned Exclusively.

\* \* \*

(B) Existing Fuel Combustion Sources Located Outside the Chicago, St. Louis (Illinois) and Peoria Major Metropolitan Areas. No person shall cause or allow the emission of sulfur dioxide into the atmosphere in any one hour period from any existing fuel combustion source, burning solid fuel exclusively, located outside the Chicago, St. Louis (Illinois) and Peoria major metropolitan areas, to exceed the following:

(i) 6.0 pounds of sulfur dioxide per million btu of actual heat input, on or after May 30, 1975; and

(ii) 1.8 pounds of sulfur dioxide per million btu of actual heat input for all such fuel combustion emission sources located within any MMA other than Chicago, Peoria, and St. Louis (Illinois) which, according to any one ambient air monitoring station operated by or under supervision and control of the Agency within such MMA, has an annual arithmetic average sulfur dioxide level greater than; [*sic*] [formula]." (*In re Proposed Amendments to Chapter 2: Air Pollution, Rule 204, Sulfur Standards and Limitations* (1980), 38 Ill. PCB Op. 481, 483-84.)

"(e) Combination of Fuel Combustion Emission Sources. No person shall cause or allow the total emissions of sulfur dioxide into the atmosphere in any one hour from all fuel combustion emission sources owned or operated by such person and located within a 1 mile radius from the center point of any such fuel combustion emission source to exceed the emissions determined by the following equations: [formula]." *In re Proposed Amendments,* 38 Ill. PCB Op. at 486-87.

Section 201.144 of the "Prohibitions" subpart of the "Permits and General Provisions" part of the Board's Air Pollution Rules provides in pertinent part:

"No person shall cause or allow the operation of any existing emission source or any existing air pollution control equipment without first obtaining an operating permit from the Agency, except as provided in Section 201.146." (35 Ill. Adm. Code 201.144 (1985).)

Section 201.162 of the "Permit Applications and Review Process"

subpart of the "Permits and General Provisions" part of the Board's Air Pollution Rules provides:

"No operating permit shall be valid longer than five years or such shorter period as the Agency may specify in the operating permit as necessary to accomplish the purposes of the Act and this Chapter." (35 Ill. Adm. Code 201.162 (1985).)

Thus the owner of a sulfur dioxide emission source is apparently required by section 214.186 to obtain a new permit of the type described in sections 201.144 and 201.162 once the facility exceeds the emission limitations prescribed by section 214.186.

The record reflects that routine operating permits for CIPS' Meredosia generating unit MB—5 were issued in August 1980, July 1982, and October 1984. None of those permits contained a specific limitation on sulfur dioxide emissions. Included among the standard conditions for those permits were the following:

"[1.] The issuance of an operating permit by the Agency does not release the permittee from compliance with other applicable statutes of the State of Illinois or with applicable local laws, regulations or ordinances.

\* \* \*

[5.] The equipment covered by this permit shall be operated in such a manner that the disposal of air contaminants collected by the equipment shall not cause a violation of the Environmental Protection Act or Regulations promulgated thereunder.

[6.] The permittee shall maintain the equipment in such a manner that the performance of such equipment shall not cause a violation of the Environmental Protection Act or Regulations promulgated thereunder."

The standard conditions attached to the permit issued in August 1986, which contains the disputed sulfur dioxide emission limitation, similarly provide:

"[1.] The issuance of this permit does not release the permittee from compliance with state and federal regulations which are part of the Illinois State Implementation Plan, as well as with other applicable statutes and regulations of the United States or the State of Illinois or with applicable local laws, ordinances and regulations.

\* \* \*

[6.] The facilities covered by this permit shall be operated in such a manner that the disposal of air contaminants collected by the equipment shall not cause a violation of the Environmental Protection Act or regulations promulgated thereunder.

[7.] The permittee shall maintain all equipment covered under this permit in such a manner that the performance of such equipment shall not cause a violation of the Environmental Protection Act or regulations promulgated thereunder."

CIPS contends that with the 1978 amendment of Rule 204, the 6.0 pounds/mbtu sulfur dioxide emission limitation for large emission sources, such as its Meredosia MB—5 generating unit, was completely eliminated because the Board found that it was technically and economically infeasible. CIPS argues that the Board cannot now subject its Meredosia generating unit to a limitation which it has found technically and economically infeasible, and that it cannot delegate to the Agency the power to impose such a limitation.

CIPS further asserts that imposition on its Meredosia generating unit of the 6.0 pounds limitation is inconsistent with the purpose of section 214.186, which is to protect ambient air quality. CIPS states that the 6.0 pounds sulfur dioxide emission limitation is not an effective method of controlling ambient air quality and that, rather, ambient air quality is best controlled by the limitations on the total emissions of sulfur dioxide into the atmosphere from all fuel combustion emission sources at a particular location contained in sections 214.183 and 214.184. CIPS further argues, in effect, that the PSD increments mentioned in section 214.186 are not applicable to its Meredosia station, because the PSD increments become applicable only when an emission source seeks to increase emissions, and CIPS has never sought a change from the applicability of what it terms the "old high stack" formula contained in present section 214.184 to its Meredosia power station.

Finally, CIPS states that assuming *arguendo* the Agency is authorized to impose the 6.0 pounds sulfur emission limitation on its Meredosia generating unit, the record contains no evidence which would justify imposition of such a limitation. Therefore, CIPS contends that at the very least this cause should be remanded with instructions to either develop a record demonstrating a necessity for the 6.0 pounds emission limitation condition or to delete that condition from the permit for its Meredosia MB—5 steam generating unit.

The Board asserts that it correctly concluded that the inclusion of the 6.0 pounds per million btu sulfur dioxide emission limitation in the latest operating permit for CIPS' Meredosia generating unit is consistent with the plain meaning of its regulations. The Board states that section 214.186 presents CIPS with the alternative of either submitting a new permit application demonstrating that total emissions from its Meredosia generating unit are consistent with Federal stand-

ards or of complying with the sulfur dioxide emission limitations prescribed by the version of previous Rule 204 adopted by section 214.186. The Board notes that the version of Rule 204 in effect prior to December 15, 1978, specifically limits sulfur dioxide emissions to 6.0 pounds per million btu of actual heat input. The Board asserts that since CIPS has not submitted a permit application demonstrating that sulfur dioxide emissions from its Meredosia generating unit are otherwise consistent with Federal standards, the 6.0 pounds emission limitation applies. (The Board does not specify what "Federal Standards" are purportedly applicable to CIPS' Meredosia generating unit.)

The Board also argues that the history of section 214.186 (particularly a 1980 amendment of former Rule 204), as well as the language of that section, establishes that its purpose is to ensure that emissions under the relaxed sulfur dioxide emissions standards adopted in 1978 are consistent with Federal requirements. The Board states that in 1978 it relaxed the 6.0 pounds emission limitation, but only on the condition that emission sources demonstrate they would comply with Federal air pollution requirements despite noncompliance with the 6.0 pounds limitation. The Board points out that CIPS could have submitted comments and requested a hearing on the conditions under which the 6.0 pounds limitation was relaxed, but did not do so.

Finally, the Board contends that CIPS' challenge to the Agency's authority to include a sulfur dioxide emission limitation in the operating permit for the Meredosia generating unit is not properly before this court, since it amounts to a challenge to the Board's rulemaking process and the contents of properly enacted regulations. Rather, the Board contends that the only issue before this court is whether based on the relevant circumstances, the Agency properly included the 6.0 pounds limitation in the operating permit for the Meredosia generating unit. The Board contends that it did, since the 6.0 pounds limitation is consistent with relevant Federal and State statutes and regulations, and particularly because it is consistent with the plain meaning of section 214.186.

In its reply brief, CIPS asserts that sulfur dioxide emission limitations based on total emissions from a particular location during a one-hour period permit operators of power plants much greater flexibility in the operation of their facilities than do limitations measured in terms of pounds of emissions per million btu of heat input. CIPS contends that under the latter standard, only the quality of coal burned is important, while under the former standard, a high sulfur coal may be utilized in combination with a low sulfur coal, so long as the total sulfur dioxide emissions do not exceed the total maximum permissible

amount. CIPS also states that the Board at no time found that the 6.0 pounds emission limitation was necessary to achieve any federally required ambient air quality standard. CIPS further argues that at least until the present case, the Board always recognized that the pounds per hour emission limitation was the only one of significance for maintaining ambient air quality and that "a pounds per million BTU standard, while a useful shorthand, was not the critical measurement." Also, CIPS states that the very language of section 214.186 is aimed at assuring that the pounds per hour emissions limitations are complied with.

CIPS further asserts that contrary to the Board's arguments it does not contend in this appeal that any Board regulations are invalid. It maintains that instead, all of its arguments are directed to the validity of a permit condition. CIPS finally states that it is undisputed that it did not seek to increase sulfur dioxide emissions in its latest application for a renewal of its Meredosia generating unit's operating permit and that if emissions have not changed, there can be no concern about a deterioration in air quality.

■■ On the basis of the language of the applicable rules and regulations and the Agency's long-standing failure to include the 6.0 pounds per million btu of actual heat input sulfur dioxide emission limitation in previous operating permits for CIPS' Meredosia generating unit, we hold that the Agency erroneously included the 6.0 pounds limitation in the August 1986 operating permit for that facility. There is apparent agreement among the parties that the sulfur dioxide emissions of CIPS' Meredosia generating unit are limited by either section 214.183 or section 214.184. The 6.0 pounds emission limitation is not mentioned in either of the above sections. Section 214.186 provides that an owner or operator of a fuel combustion emission source subject to either sections 214.183 or 214.184 shall not allow the total emissions of sulfur dioxide into the atmosphere to exceed the level of sulfur dioxide emissions previously permitted under the version of old Rule 204 in effect prior to December 15, 1978.

Under subsection (c)(1)(B)(i) of the version of Rule 204 in effect prior to December 15, 1978, "emission[s] *** from any existing fuel combustion source, burning solid fuel exclusively, located outside the Chicago, St. Louis (Illinois) and Peoria major metropolitan areas" were limited, "in any one hour period" to "6.0 pounds of sulfur dioxide per million btu of actual heat input." (*In re Proposed Amendments,* 38 Ill. PCB Op. at 484.) Also, subsection (e) of the relevant version of Rule 204 limited "total emissions of sulfur dioxide into the atmosphere in any one hour from all fuel combustion emission sources

\*\*\* located within a 1 mile radius from the center point of any such fuel combustion emission source" in accordance with a formula stated in that subsection. (38 Ill. PCB Op. at 486-87.) The crucial question is what portion(s) of the version of Rule 204 in effect prior to December 15, 1978, are adopted by section 214.186.

Section 214.186 limits "total emissions of sulfur dioxide into the atmosphere from all fuel combustion emission sources \*\*\* located within 1 mile radius (1.6 km) from the center point of any such fuel combustion source." (35 Ill. Adm. Code 214.186 (1985).) This is practically the same language used in subsection (e) of the relevant version of Rule 204 to describe the emissions to which the formula contained in that subsection is applicable. It is not the language used in subsection (c)(1)(B)(i) of the applicable version of Rule 204 to describe the emissions to which the 6.0 pounds/mbtu limitation is applicable. In other words, the version of Rule 204 in effect prior to December 15, 1978, contained limitations on two groups of emissions—(1) emissions from single fuel combustion sources and (2) total emissions from all fuel combustion sources owned by the same person located within one mile of each other. Section 214.186 requires the latter group to conform only to the applicable version of the former Rule 204(e) absent a new operating permit obtained pursuant to that section. Therefore, there is no basis in the language of section 214.186 for the Board's decision that the 6.0 pounds/mbtu sulfur dioxide emission limitation—which pertained to a category of emissions which is not mentioned in section 214.186—is imposed upon large emission sources by that section unless the owner demonstrates that the emissions will not violate any applicable PSD increment.

Our conclusion that the 6.0 pounds/mbtu limitation is not adopted by section 214.186 with respect to large emission sources is consistent with the rule of construction that all words of an enactment should, if possible, be given some effect. (*Niven v. Siqueira* (1985), 109 Ill. 2d 357, 487 N.E.2d 937.) If section 214.186 were construed as adopting the 6.0 pounds/mbtu sulfur dioxide emission limitation with respect to large emission sources, the words "total," "all," and "located within 1 mile radius (1.6 km) from the center of any such fuel combustion source" contained in that section would be superfluous.

Moreover, it cannot reasonably be argued that the regulations here at issue are not ambiguous. Prior to issuance of the August 1986 operating permit for CIPS' Meredosia generating unit, the Agency's long-standing practice in interpreting these ambiguous regulations had been not to include the 6.0 pounds/mbtu sulfur dioxide emission limitation in operating permits for that facility. The Board points to

no changed circumstances or changes in regulations which would require inclusion of the 6.0 pounds/mbtu sulfur dioxide emission limitation in the operating permit for that facility after its noninclusion in three prior operating permits.

Where the language of a regulation is clear and certain, an administrative agency's interpretation of the regulation which runs counter to the regulation's plain language is entitled to little, if any, weight in determining the effect to be accorded the regulation. (See *Chicago Transit Authority v. Industrial Comm'n* (1986), 141 Ill. App. 3d 930, 491 N.E.2d 58.) If, however, the meaning of a regulation is debatable, and circumstances have not changed, an administrative agency is bound by a long-standing interpretation of the regulation. As stated by the Supreme Court in *United States v. Leslie Salt Co.* (1956), 350 U.S. 383, 396, 100 L. Ed. 441, 451, 76 S. Ct. 416, 424, quoting *Norwegian Nitrogen Products Co. v. United States* (1933), 288 U.S. 294, 315, 77 L. Ed. 796, 807, 53 S. Ct. 350, 358:

> " '[A]dministrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. [Citations.] The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' "

Illinois courts have likewise held that administrative agencies are bound by their long-standing policies and customs of which affected parties had prior knowledge. (*Gatica v. Department of Public Aid* (1981), 98 Ill. App. 3d 101, 423 N.E.2d 1292; *Holland v. Quinn* (1978), 67 Ill. App. 3d 571, 385 N.E.2d 92; see also *Briscoe v. Kusper* (7th Cir. 1970), 435 F.2d 1046.) In conformity with this principle, the Second District of this court recently considered prior decisions of the Environmental Protection Agency not to include a specific condition in a waste water discharge permit and the inconsistency of including such a condition in a subsequent permit with the Agency's prior interpretation of the applicable rules, in determining whether that condition was properly included in a subsequent waste water discharge permit. (*Dean Foods Co. v. Illinois Pollution Control Board* (1986), 143 Ill. App. 3d 322, 492 N.E.2d 1344.) In view of the lack of any changed circumstances which would support the Agency's unprecedented decision to include the 6.0 pounds/mbtu sulfur dioxide emission limitation in CIPS' August 1986 operating permit for its Meredosia generating unit, we hold that the Agency is bound by its prior policy of not sub-

jecting that facility to a 6.0 pounds/mbtu sulfur dioxide emission limitation.

The conclusion which we reach regarding the meaning of section 214.186 is also consistent with the relevant portion of the Board's explanation of its reasons for adopting the 1978 amendments of former Rule 204, which is now section 214.186:

> "All sources located outside the three largest MMA's were previously required to comply with a pounds per million btu $SO_2$ standard of 6.0 in addition to the pounds per hour standard determined by Rule 204(e). As mentioned previously, this rule was based on the washability of Illinois coal. *This requirement has been eliminated because the record indicated it is not technically or economically feasible for all sources to meet the standard by washing Illinois coal* \*\*\*. *However, the Board has retained a pounds per million btu standard of 6.8 for small sources (with heat input less than 250 MBTU/hr.*) and has allowed such sources to choose between this limit and the pounds per hour standard determined by Rule 204(e)." (Emphasis added.) (*In re Proposed Amendments to Chapter 2, Part II, Sulfur Dioxide Emissions* (1979), 32 Ill. PCB Op. 573, 582.)

The above statement makes it clear the Board did not intend that the 6.0 pounds per million btu sulfur dioxide emission limitation be applicable to large emission sources following the 1978 amendments.

The Board places great reliance on the following passage which also appears in the explanation of the 1978 amendments:

> "However, as mentioned previously, Section 163 of the Clean Air Act as amended in 1977 requires that for any given area the maximum allowable increase in concentrations of $SO_2$ over the baseline concentration of $SO_2$ not exceed a certain amount, commonly known as the PSD increment. The U.S. Environmental Protection Agency, the Agency and Commonwealth Edison Co. expressed concern in public comments (P.C. No.'s 52, 51 and 42, respectively) that the proposed regulations could in some cases allow sources to increase emissions and, therefore, possibly violate the PSD increment. Three rules which could conceivably result in increased emissions are the new Rule 204(e)(1) formula (see Ex. 25), Rule 204(e)(3) and the 6.8 lbs/MBTU optional standard for sources burning less than 250 MBTU/hr. \*\*\* Rule 204(e)(4) \*\*\* precludes sources complying with the Rule 204(e)(1) formula or the 6.8 lbs/MBTU standard from increasing emissions without first obtaining a new operating permit from the Agency based on an application which

proves that the PSD increment will not be violated." (32 Ill. PCB Op. at 582-83.)

This portion of the Board's explanation of the 1978 amendments does not negate the statement that the 6.0 pounds per million btu sulfur dioxide emission limitation is not technically or economically feasible with respect to all sources. Moreover, there is nothing in this portion of the Board's explanation which supports a conclusion that the pre-amendment emission limitations applicable to all emissions from sources within one mile of each other owned by the same person are inadequate to insure compliance with the Federal requirements. Thus this statement does not require a holding that compliance with the 6.0 pounds limitation is an indispensable means of insuring compliance with Federal air quality requirements.

The Board's argument premised on a 1980 amendment of what is now section 214.186 does not require a result different from that which we here reach. In adopting the 1980 amendment on which the Board relies, the Board stated:

"It has come to the Board's attention, through notice of a proposed rule by USEPA (44 F.R. 76308), that there are some inconsistencies due to typographical errors in the Board's Order of December 14, 1978. Rule 204(e)(4) [now section 214.186], line 10, contains a reference to 'previous Rule 204(e) [now sections 214.182 through 214.186 (35 Ill. Adm. Code 214.182 through 214.186)] ***.' The inclusion of the letter 'e' is a typographical error; the phrase should read 'previous Rule 204 [now sections 214.101 through 214.421 (35 Ill. Adm. Code 214.101 through 214.423)] ***.' This is apparent from the beginning language of Rule 204(e)(4): 'No owner or operator of a fuel combustion emission source whose sulfur dioxide emission limitation is determined by Rule 204(c)(1)(B) [now section 214.142 (35 Ill. Adm. Code 214.142 (1985)] ***.' Since Rule 204(c)(1)(B) replaces prior 204(e) *and* prior 204(c)(1)(B) for smaller sources, the reference to 'previous Rule 204(e)' is inconsistent with the introductory language quoted above." (Emphasis in original.) (*In re Proposed Amendments to Chapter 2, Part II, Sulfur Dioxide Emissions* (1980), 37 Ill. PCB Op. 367.)

On the basis of the above statement, it is obvious that the 1980 amendment of what is now section 214.186 was adopted for the sole purpose of subjecting small emission sources which elect to be governed by an emission limitation expressed in terms of pounds of sulfur dioxide emissions per megawatt hour of actual heat input—as is permissible under section 214.142 (35 Ill. Adm. Code 214.142 (1985) (for-

merly subsection (c)(1)(B) of Rule 204))—to the pounds per million btu of actual heat input emission limitation of the version of Rule 204 in effect prior to December 15, 1978, absent the demonstration required by section 214.186. The 1980 amendment could not have been intended to reimpose a pounds per million btu emission limitation on large emission sources, for the previously quoted portion of the Board's explanation of the 1978 amendments of former Rule 204 unequivocally states that sulfur dioxide emission limitations expressed in terms of pounds of emissions per million btu of actual heat input have been eliminated as a mandatory standard (*In re Proposed Amendments*, 32 Ill. PCB Op. at 582), and the explanation of the 1980 amendment does not expressly negate the relevant portion of the explanation of the 1978 amendments. (Whether section 214.186 does in fact subject small emission sources to the 6.0 pounds/mbtu sulfur dioxide emission limitation absent the required demonstration is a question which we do not now decide.)

■ Finally, we reject the Board's contention that CIPS, in contesting the inclusion of the 6.0 pounds/mbtu sulfur dioxide emission limitation in its operating permit for its Meredosia generating unit, is attempting to challenge the validity of a Board regulation. CIPS does not request this court to declare any properly promulgated rule or portion thereof invalid; rather, CIPS essentially contends that there is no language in any of the Board rules or regulations which supports imposition of a 6.0 pounds/mbtu sulfur dioxide emission limitation on its Meredosia MB—5 generating unit. It is therefore manifest that this case does not involve a challenge to the validity of any properly enacted Board rules or regulations.

In summary, the inclusion of the 6.0 pounds/mbtu sulfur dioxide emission limitation in the operating permit for CIPS' Meredosia steam generating unit MB—5 is contrary to the plain language of the applicable rules and regulations and the Board's explanation thereof and is violative of the principle that administrative agencies may not depart from long-established constructions of ambiguous regulations absent significant changes in circumstances. For these reasons, we reverse the Board's decision and remand with directions to order the Agency to delete the condition, "$SO_2$ emissions shall not exceed 6.0 lbs. per million btu" from CIPS' operating permit for its steam generating unit MB—5 at Meredosia, Illinois.

Reversed and remanded with directions.

LUND and KNECHT, JJ., concur.